UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ACCEPTANCE INDEMNITY : | |
| INSURANCE COMPANY, : | |
| : | |
| Plaintiff : | |
| : | |
| v. : | No. 5:15-cv-02954 |
| : | |
| JJA AUTO SALES, LLC, : | |
| *doing business as* JJA Auto Sales; : | |
| SAID FARAJ; SAID ASSAD J. FARA,[1] : | |
| : | |
| Defendants. : | |

**MEMORANDUM OPINION AND ORDER**

**Acceptance Indemnity's Motion for Summary Judgment, ECF No. 22 – Denied**

**Joseph F. Leeson, Jr.**                                                                                              **July 12, 2016**
**United States District Judge**

**I.      Introduction**

On August 6, 2013, in Brooklyn, New York, a vehicle operated by Defendant Said Faraj allegedly struck a pedestrian. Def.'s Answer to Pl.'s Facts ¶ 4, ECF No. 25. At the time of the accident, a Pennsylvania dealer registration plate registered to Defendant JJA Auto Sales, LLC was affixed to the vehicle. *Id.* ¶¶ 5-6.

The pedestrian filed suit in the Supreme Court of the State of New York against both Faraj and JJA Auto Sales. The Plaintiff in this action, Acceptance Indemnity Insurance Company, is JJA Auto Sales' insurer. Acceptance Indemnity claims that the accident does not fall within the scope of JJA Auto Sales' insurance coverage, and it seeks a declaration that it has

---

[1]      Said J. Fara and Said Faraj refer to the same person. *See* Answer ¶ 10, ECF No. 10. According to his deposition testimony, the latter is correct. *See* Faraj Dep. 3:8-19, ECF No. 24-4.

1

no duty to defend either JJA Auto Sales or Faraj against the pedestrian's claims or indemnify either of them for any damages that they may be required to pay.

Acceptance Indemnity now moves for summary judgment. Because there is a genuine dispute over the facts essential to determining whether this accident falls within the scope of JJA Auto Sales' insurance coverage, Acceptance Indemnity's motion is denied.[2]

## II. Factual Background

The insurance policy Acceptance Indemnity issued to JJA Auto Sales provides liability coverage for automobile accidents resulting from "garage operations," Compl. Ex. B, at 18-19, ECF No. 1-3,[3] which the policy defines as follows:

> [T]he ownership, maintenance, or use of locations for garage business and that portion of the roads or other accesses that adjoin these locations . . . the ownership, maintenance or use of the "autos" indicated in Section I of this Coverage Form as covered "autos" . . . [and] all operations necessary or incidental to a garage business.

---

[2] Defendants contend that this action must be dismissed because Acceptance Indemnity did not join the injured pedestrian to this action. *See* Fed. R. Civ. P. 12(b)(7). They contend that under both New York and Pennsylvania law, an injured party who is suing an insured tortfeasor must be joined to a declaratory judgment action between the tortfeasor and its insurer. Assuming that is true, those state rules, procedural in nature as they are, do not govern federal declaratory judgment actions. *See Liberty Mut. Ins. Co. v. Treesdale, Inc.*, 419 F.3d 216, 229 (3d Cir. 2005). Instead, whether the injured party must be joined to a federal declaratory judgment action between the tortfeasor and its insurer is governed by Federal Rule of Civil Procedure 19. The Third Circuit has considered this question twice, both times in dicta, and has given two different answers. *Compare Treesdale*, 419 F.3d at 230 (concluding that an injured party is not a necessary party to a declaratory judgment action between the tortfeasor and its insurer because the injured party possesses only a financial interest in the outcome), *with Fed. Kemper Ins. Co. v. Rauscher*, 807 F.2d 345, 354 n.5 (3d Cir. 1986) ("Under Rule 19 . . . , the [injured parties] qualify as indispensable parties in this action."). While this issue has generated some disagreement in this district as of late, the weight of authority is that the injured party is not a necessary party. *See Scottsdale Ins. Co. v. RSE Inc.*, 303 F.R.D. 234, 238 (E.D. Pa. 2014); *Emp'rs Mut. Cas. Co. v. Burke Landscaping, Inc.*, No. 13-4043, 2014 WL 981195, at *2 & n.3 (E.D. Pa. Mar. 13, 2014) (Restrepo, J.) (viewing an insurer's decision to not join an injured party as "presumably . . . a valid choice" but noting the existence of authority to the contrary); *Hartford Cas. Ins. Co. v. Cardenas*, 292 F.R.D. 235, 246 (E.D. Pa. 2013). *But see Bhd. Mut. Ins. Co. v. Salem Baptist Church of Jenkintown*, No. 10-cv-7072, 2012 WL 1526851, at *6 (E.D. Pa. Apr. 30, 2012). Even if the injured party were a required party under Rule 19(a), the proper course of action would be to join her, not to dismiss this action. *See* Fed. R. Civ. P. 19(a)(2). Defendants have not pointed to any reason why it would not be feasible to join the injured party as a co-defendant to this action, given that she has alleged in her underlying tort suit that she is a resident of New York—Faraj's place of citizenship. *See* Compl. Ex. A ¶ 1, ECF No. 1-2.

[3] There is no dispute over the authenticity of the copy of the insurance policy attached to Acceptance Indemnity's Complaint. *See* Answer ¶ 16.

2

*Id.* at 31. JJA Auto Sales' "garage business" is dealing in used cars, *id.* at 2, and the "covered 'autos'" are limited to only those private passenger automobiles owned by JJA Auto Sales and any other automobiles used in connection with its business, *id.* at 2, 17.[4] The policy contains one notable exception, entitled the "Contract Driver Exclusion." *See id.* at 14. That exception provides that the policy does not provide for any "Contract Driver Coverage," with the term "Contract Driver" defined as "[a]ny person, which the insured hires on a temporary basis for pick-up and delivery of a covered auto." *Id.*

      Central to the question of whether the accident falls within the scope of the policy is whether the vehicle that Faraj was operating was owned by JJA Auto Sales and whether Faraj was involved in JJA Auto Sales' business at the time of the accident. Fouad Baladi, the owner of JJA Auto Sales, testified that he purchased the vehicle Faraj was operating from a seller in New York a few months before the accident. Baladi Dep. 87:12-88:5, ECF No. 24-7. According to Baladi, he discovered at the time of purchase that the vehicle was in need of repair, and he elected to have the vehicle repaired in New York because he did not want to "drive it all the way to [Pennsylvania] with problems." *Id.* at 100:13-101:7. Baladi testified that after the repairs were complete, he asked Faraj, whom he had come to know through mutual friends, to check on the vehicle to see if it had been repaired properly. *Id.* at 108:23-111:21. Faraj agreed to do so as a favor to Baladi. *Id.* at 115:7-8. According to Baladi, it was during this test drive that the accident occurred. *Id.* at 116:3-117:13. Other than this information, Baladi remembers little about his purchase of the vehicle and has no documentation of the transaction. *See id.* at 88:1-94.25.

      During Faraj's deposition, he initially testified to this same version of events. *See* Faraj Dep. 45:21-50:25, ECF No. 24-4. Toward the end of the deposition, however, counsel to

---

[4] That includes automobiles owned by JJA Auto Sales' employees and members and members of their households that are used in the business but does not include any automobiles JJA Auto Sales leases, hires, rents, or borrows. *See* Compl. Ex. B., at 2, 17.

3

Acceptance Indemnity announced that he was in possession of information suggesting that Faraj, not Baladi, was the true owner of the vehicle. *Id.* at 140:16-18.[5] After being confronted with that information, Faraj proceeded to give an entirely different account. Faraj conceded the vehicle in fact belonged to him, and that he had purchased it in May 2012—over a year prior to the accident—from a person named Joseph Palo Ortiz, who had listed the vehicle for sale in an online advertisement.[6] *Id.* at 144:22-145:15, 147:20-24.  Faraj testified that this was the first vehicle he had ever purchased, and, as a twenty-year-old at the time, he was concerned that obtaining insurance for the vehicle would have been prohibitively expensive. *See id.* at 158:15-159:16. Through an intermediary, Faraj was introduced to Baladi, who was willing to allow Faraj to use his dealer registration plate—and its accompanying insurance coverage—for a fee. *Id.* at 147:11-149:4, 157:20-158:4. Faraj arranged to meet with Baladi in a deli in Manhattan, and Baladi gave him the dealer registration plate in exchange for approximately twelve-hundred dollars. *Id.* at 147:25-149:22. Faraj testified that, other than this transaction, he has never had any dealings with Baladi. *Id.* at 150:21-23. As for the testimony he had originally given, Faraj stated

---

[5] When Acceptance Indemnity's counsel confronted Faraj with this contrary information, Faraj asked for an opportunity to consult with an attorney. Defendants claim that the examination should have been terminated immediately after he made that request. In support of this proposition, Defendants cite a case pertaining to the Fifth Amendment right to terminate a custodial interrogation if an attorney is not present, *see* Defs.' Br. 9, ECF No. 26 (citing *Edwards v. Arizona*, 451 U.S. 477 (1981)), a principle that has no applicability to a civil deposition of a person not in the custody of law enforcement. *See Edwards*, 451 U.S. at 481-82 ("[A]n accused has a Fifth and Fourteenth Amendment right to have counsel present during custodial interrogation."). Regardless, after Faraj asked to speak with an attorney, the deposition was recessed for nearly thirty minutes to afford him the chance to do so. *See* Faraj. Dep. 144:2-21; *see also Hall v. Clifton Precision*, 150 F.R.D. 525, 527-29 (E.D. Pa. 1993) (observing that while "private conferences between deponents and their attorneys during the taking of a deposition are improper, . . . a private conference between witness and attorney is permissible if the purpose of the conference is to decide whether to assert a privilege.").

[6] In support of this contention, Acceptance Indemnity proffers an affidavit from Ortiz with a copy of the email he received confirming that he had posted an advertisement on Craigslist for the vehicle on May 2, 2012. *See* Ortiz Aff. ¶¶ 7-8, ECF No. 24-6. The affidavit also contains Ortiz's phone records which show calls had been made between him and Faraj's cell phone on May 19, 2012. *Id.* ¶¶ 11-19. However, no bill of sale or any other writing regarding the sale of the vehicle was prepared and title for the vehicle was not transferred from his mother's name to the purchaser of the vehicle. *Id.* ¶¶ 21-22.

that Baladi had instructed him to tell that version of events if he were ever to be contacted by Baladi's insurance company:

> Q: Let me put it this way. There's this whole story about you picking up the vehicle at a mechanic. All of that is nonsense; correct? A. Correct. . . . Q: So, every time that Mr. Baladi has indicated to the insurance company that he bought this car himself has been a lie? A. It's safe to say.

*Id.* at 151:8-156:14.

To corroborate this version of events, Acceptance Indemnity has produced an affidavit from Ortiz, the seller, stating that he listed the vehicle for sale through an online advertisement in May 2012. *See* Ortiz Aff. ¶¶ 4, 7. Accompanying the affidavit are phone records showing that calls were placed between his telephone number and Faraj's telephone number at that time. *Id.* ¶¶ 9-21 & Ex. 2. However, according to Ortiz, there is no other documentation of the sale. *See id.* ¶¶ 21-22.

## II.   Legal Standard – Motion for summary judgment[7]

Summary judgment is appropriate if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if the fact "might affect the outcome of the suit under the governing law," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248(1986), and a dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving

---

[7]   Defendants argue that this action should be governed by New York law, and contend—with little explanation—this case should be transferred to New York "to apply both New York declaratory judgment law and New York auto negligence law." *See* Defs.' Br. 7. A request for a federal court sitting in diversity to issue a declaratory judgment is governed by the Declaratory Judgment Act, 28 U.S.C. § 2201, and the Federal Rules of Civil Procedure, not the procedures that apply to declaratory judgment actions brought in the courts of the forum state. *See Rauscher*, 807 F.2d at 352 ("It is settled law that, as a procedural remedy, the federal rules respecting declaratory judgment actions, apply in diversity cases."). As for the substantive law that governs this dispute, Defendants offer no support for the proposition that a dispute over the scope of an insurance contract made in Pennsylvania for the purpose of providing insurance coverage to a Pennsylvania business should be governed by New York law. *See Neville Chem. Co. v. Union Carbide Corp.*, 422 F.2d 1205, 1210-11 (3d Cir. 1970) ("The Pennsylvania Supreme Court . . . looks to the law of the place with the most significant relationship to the parties and the transaction, on each issue, or the 'center of gravity' of the contract."). Nor do Defendants explain how transferring this action to a district court in New York, on the eve of trial, would be convenient for the parties and witnesses or serve the interests of justice. *See* 28 U.S.C. § 1404.

party." *Id.* When the evidence favoring the nonmoving party is "merely colorable" or "not significantly probative, summary judgment may be granted." *Id.* at 249–50 (citations omitted). The parties must support their respective contentions—that a fact cannot be or is genuinely disputed—by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. R. Civ. P. 56(c)(1). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

### III. Analysis[8]

This action presents a fundamental credibility dispute between Faraj and Baladi, and "conflicts of credibility should not be resolved on a hearing on the motion for summary judgment unless the opponent's evidence is 'too incredible to be believed by reasonable minds.'" *Losch v. Borough of Parkesburg*, 736 F.2d 903, 909 (3d Cir. 1984) (quoting 6 James Wm. Moore et al., *Moore's Federal Practice* ¶ 56.15(4) (2d ed. 1976)). This is so because "the importance of

---

[8] In their response to Acceptance Indemnity's summary judgment motion, Defendants contend—for the first time—that this Court should decline to exercise jurisdiction over this action pursuant to the discretion afforded by the Declaratory Judgment Act. *See* 28 U.S.C. § 2201(a). A number of factors inform a district court's exercise of this discretion, including the likelihood that a federal court declaration will resolve the uncertainty of obligation which gave rise to the controversy, the convenience of the parties, the public interest in settlement of the uncertainty of obligation, the availability and relative convenience of other remedies, a general policy of restraint when the same issues are pending in a state court, avoidance of duplicative litigation, prevention of the use of the declaratory action as a method of procedural fencing or as a means to provide another forum in a race for res judicata, and—most importantly—whether there are parallel proceedings pending in state court, which "militates significantly" in favor of declining jurisdiction. *See Reifer v. Westport Ins. Corp.*, 751 F.3d 129, 146 (3d Cir. 2014). In cases such as this that arise in the insurance context, also pertinent are (i) the "inherent conflict of interest between an insurer's duty to defend in a state court and its attempt to characterize that suit in federal court as falling within the scope of a policy exclusion," (ii) whether one of the parties has vigorously objected to jurisdiction, and (iii) whether the applicable state law is settled or is instead "uncertain and or undetermined." *See id.* at 141, 146-47 (quoting *State Auto Ins. Co. v. Summy*, 234 F.3d 131, 135-36 (3d Cir. 2000)). The underlying tort suit pending in New York may constitute a parallel state proceeding, *see Rachel II, Inc. v. State Nat'l Ins. Co.*, No. 5:15-cv-01096, 2016 WL 1273941, at *6 (E.D. Pa. Mar. 31, 2016), which weighs strongly in favor of declining to exercise jurisdiction. So too does the fact that this dispute does not present any difficult questions of state law. Outweighing those considerations, however, is the inefficient and duplicative litigation that would result if this Court declined to exercise jurisdiction over this action on the eve of trial and require the parties to begin anew in state court. The fact that Defendants waited nearly one year after this action was filed, after discovery had closed, to ask this Court to decline jurisdiction—and did so not by motion but in their opposition to a motion for summary judgment—cannot be described as a "vigorous objection" to this Court's jurisdiction. *See Reifer*, 751 F.3d at 141 (quoting *Summy*, 234 F.3d at 136).

having the witness examined and cross-examined in presence of the court and jury" cannot be overstated. *Id.* (quoting *Arnstein v. Porter*, 154 F.2d 464, 470 (2d Cir. 1946)).

Based on the evidence that has been presented, Faraj's account is the more credible one. He does not appear to have anything to gain by telling his version of the events, which stands to strip him of insurance coverage for the accident, and his account is corroborated by Ortiz's affidavit and the accompanying phone records. Baladi, by contrast, has an incentive to conceal the improper use of one of his dealer registration plates, *see* 75 Pa. Cons. Stat. § 1336(a) (restricting the display of a dealer registration plate to only a "vehicle which is owned or in the possession of a dealer" and only if the vehicle is being held for sale and used for certain limited purposes), and his recollection of the events surrounding his supposed purchase of the vehicle is conspicuously short on detail. But while Baladi's account is not the most credible one, it is plausible, and in light of the fact that there is little evidence other than the competing testimony of these two witnesses, affording the parties the opportunity to present their witnesses for observation under oath and subject them to cross-examination is the prudent course of action.

Acceptance Indemnity argues, however, that even if Baladi's account is true, Faraj would have been acting as a "Contract Driver" for JJA Auto Sales on the day that he allegedly struck the pedestrian, which would mean that this accident would be excluded from the scope of the insurance coverage by virtue of the policy's "Contract Driver Exclusion." However, this argument is not borne out by Baladi's testimony. Baladi testified that after the repairs on the vehicle were completed in New York, he asked Faraj "[t]o go check it for [him] . . . [a]nd if it runs okay, to let [him] know." Baladi Dep. 111:12-18; *see id.* at 111:19-21 ("Q. Okay. So you wanted him to test drive the vehicle to make sure it was repaired properly? A. Right."). Under the terms of the insurance policy, a "Contract Driver" is a person whom "the insured hires on a

temporary basis for pick-up and delivery." If Baladi's testimony is to be believed, he asked Faraj only to test drive the vehicle to ensure it had been properly repaired, not to deliver the vehicle to him.[9] Furthermore, Baladi testified that Faraj had agreed to pick up the vehicle from the mechanic in New York as "a favor," which suggests that Faraj was not someone who Baladi had "hire[d] on a temporary basis." *See* Baladi Dep. 115:7-8. Thus, even under Baladi's version of events, the insurance policy's Contract Driver Exclusion would not apply.

One other argument that Acceptance Indemnity has made requires mention. It contends that judgment is warranted in its favor because Defendants failed to respond to any requests for admission that it served on Defendants. Among other things, Acceptance Indemnity asked Defendants to admit that Faraj purchased the vehicle he was operating on the day of the accident and that Faraj was not, and has never been, an employee of JJA Auto Sales. *See* Requests for Admission ¶¶ 3, 13-14, ECF No. 24-5. If these matters were deemed to be admitted, there would be no genuine dispute over Faraj's account of the events, and no need for a trial.

When a party serves another party with a request for admission, the "matter is admitted unless, within 30 days after being served, the party to whom the request is directed serves on the requesting party a written answer or objection." Fed. R. Civ. P. 36(a)(3). Requests for admission advance the cause of judicial efficiency by "facilitat[ing] proof with respect to issues that cannot be eliminated from the case, and . . . narrow[ing] the issues by eliminating those that can be." Fed. R. Civ. P. 36 advisory committee's note to 1970 amendment. The value of this discovery tool depends upon admissions being given binding effect; otherwise, the requesting party

---

[9] According to Baladi, after the accident occurred, the vehicle's windshield needed to be replaced. Baladi Dep. 120:15-19. Baladi testified that after his mechanic replaced the windshield, Faraj then transported the vehicle from the mechanic in New York to JJA Auto Sales in Pennsylvania. *See id.* at 122:5-11. Accordingly, Acceptance Indemnity claims that Faraj was a "contract driver" within the meaning of the insurance policy, because he was "hire[d] on a temporary basis for pick-up and delivery" of the vehicle. However, even if Faraj may have become a contract driver at some time after the accident, that does not suggest that he was acting as a contract driver at the time of the accident.

"cannot safely avoid the expense of preparing to prove the very matters on which [it] has secured the admission." *Id.* Treating a failure to respond as an admission may be a harsh result, but one that "is necessary to insure the orderly disposition of cases" and protect the value of this discovery mechanism. *United States v. Kasuboski*, 834 F.2d 1345, 1350 (7th Cir. 1987); *see Rainbolt v. Johnson*, 669 F.2d 767, 768 (D.C. Cir. 1981) ("The rule is designed to expedite litigation, and it permits the party securing admissions to rely on their binding effect.").

The harshness of the Rule is tempered by the fact that a party is allowed to move to withdraw or amend an admission, which may be appropriate "if it would promote the presentation of the merits of the action and if the court is not persuaded that it would prejudice the requesting party in maintaining or defending the action on the merits." Fed. R. Civ. P. 36(b). Here, however, Defendants have neither brought such a motion nor even acknowledged Acceptance Indemnity's contention that they failed to answer the requests. If it is true that Defendants failed to respond to the requests, it would be appropriate to deem to those matters admitted for the purpose of resolving Acceptance Indemnity's summary judgment motion. *See Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir. 1976) ("[H]is request for admissions was not denied, and for purposes of the motion for summary judgment was properly deemed admitted under Rule 36(a).").

Acceptance Indemnity's efforts fall short, however, because it has not presented any evidence showing that Defendants failed to answer the requests. For a party to reap the benefits of Rule 36—including the automatic admission of any requests not timely answered—"all the facts necessary to invoke the consequences must be made in some way to appear." *See Gilbert v. Gen. Motors Corp.*, 133 F.2d 997, 1003 (2d Cir. 1943) (refusing to deem matters admitted because the requesting party failed to produce any evidence that the responding party had not

properly answered the requests). An affidavit confirming that the requests were properly served and that no response was timely received is usually all that is necessary. *See, e.g.*, *J & J Sports Prods., Inc. v. Chauca*, No. 14-6891, 2015 WL 7568389, at *4 (E.D. Pa. Nov. 25, 2015) (relying on a declaration of the requesting party's attorney to establish that the opposing party failed to respond to requests for admission).

Acceptance Indemnity has not presented an affidavit or other evidence that shows that Defendants did not respond to its requests for admission. As a result, Acceptance Indemnity's request for summary judgment to be entered in its favor on the basis of these requests must be denied, but Acceptance Indemnity may renew its motion if it is able to present evidence that shows that Defendants failed to respond to the requests.

### IV. Conclusion

There remains a genuine dispute over the facts that are essential to resolving whether Acceptance Indemnity has a duty to defend these Defendants and indemnify them from any damages that may be awarded against them. Accordingly, this 12th day of July, 2016, Acceptance Indemnity's Motion for Summary Judgment, ECF No. 22, is **DENIED.**

BY THE COURT:

*/s/ Joseph F. Leeson, Jr.*
JOSEPH F. LEESON, JR.
United States District Judge