UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

---

| | |
|---|---|
| ACCEPTANCE INDEMNITY INSURANCE COMPANY, | : : : |
| Plaintiff | : : |
| v. | :    No. 5:15-cv-02954 : |
| JJA AUTO SALES, LLC, *doing business as* JJA Auto Sales; SAID FARAJ; SAID ASSAD J. FARA, | : : : : |
| Defendants. | : |

---

### MEMORANDUM OPINION

**Joseph F. Leeson, Jr.**                                                                                   **February 3, 2017**
**United States District Judge**

**I.      Introduction**

In this declaratory judgment action, Acceptance Indemnity Insurance Company seeks confirmation that it has no duty to defend JJA Auto Sales, LLC or Said Faraj, the two defendants here,[1] against a personal injury suit in New York. The Court held a bench trial and now finds in Acceptance's favor. This opinion contains the Court's findings of fact and conclusions of law and addresses two evidentiary objections that Defendants raised at trial.

**II.     Background**

Acceptance provided insurance coverage to JJA Auto Sales from April 2013 to August 24, 2013. It is undisputed that on August 6, 2013, while operating a vehicle displaying a Pennsylvania dealer license plate registered to JJA, Said Faraj struck a pedestrian in Brooklyn, New York. After the accident, the pedestrian filed suit against Faraj and JJA.

At issue is whether the accident is covered by the insurance policy that Acceptance issued to JJA. The answer to that question turns on whether the vehicle belonged to JJA and whether Faraj was working for JJA at the time of the accident.

Under the policy, Acceptance insured JJA against automobile accidents resulting from "garage operations," which includes "the ownership, maintenance or use of the . . . covered 'autos' . . . [and] all operations necessary or incidental to a garage business." Trial Ex. 3, at 31.

---

[1]       The complaint includes the name of two individual defendants, "Said Faraj" and "Said Assad J. Fara", but they are the same person. *See* Defs.' Am. Proposed Findings and Conclusions ¶ 2, ECF No. 67.

1

JJA's particular "garage business" is dealing in used cars, *id.* at 2, and the "covered 'autos'" under the policy are limited to two categories: private passenger automobiles that JJA owns, and other, non-owned vehicles during times when they are being used in connection with JJA's business, *id.* at 2, 17. That means that if the vehicle Faraj was driving belonged to JJA, or if Faraj was engaged in "garage business" for JJA at the time of the accident, the accident—at least as a threshold matter—may fall within the scope of the policy.

Acceptance claims, however, that the vehicle Faraj was driving belonged to him, not JJA, and that Faraj had no involvement of any sort with JJA's business. According to Acceptance, Faraj was first introduced to the owner of JJA, Fouad Baladi, approximately one year prior to the accident. Acceptance claims that Faraj, who was then twenty years old and living in Staten Island, was struggling to find affordable insurance coverage for his vehicle, a 2000 BMW, and Baladi agreed to let Faraj use one of JJA's dealer plates—and its accompanying insurance coverage—in exchange for approximately $1,200 in cash. Acceptance claims that, other than this transaction, Faraj had no connection to JJA.

Defendants claim that Faraj had purchased the vehicle on Baladi's behalf, and that the vehicle belonged to JJA at the time of the accident.

### III.   Evidence Presented at Trial

The primary evidence supporting Acceptance's version of events comes from testimony Faraj gave during an examination under oath that Acceptance conducted before this action was filed. During the examination, Faraj initially testified that he and Baladi became acquainted through their shared interest in the car dealership trade. *See* Faraj Examination 24:16-23, ECF No. 66-1.[2] Faraj testified that he was interested in getting into that line of work, and he hoped to glean knowledge about the field from Baladi, who owed a used car dealership in Pennsylvania. *Id.* at 42:14-43:3. Faraj explained that it was through this connection to Baladi that he came into possession of the 2000 BMW that he was driving on the day of the accident. According to Faraj, Baladi asked him if he would be willing to pick up a vehicle, a 2000 BMW, from a mechanic in New York and test-drive it to make sure that it had been properly repaired. *Id.* at 45:21-47:8, 50:15-25. He testified that it was during that test-drive that the accident occurred, and he claimed that he had never seen the 2000 BMW prior to that day. *Id.* at 50:11-14.

After questioning Faraj at length about that version of events, counsel to Acceptance confronted Faraj with a surprising revelation: he had in his possession information suggesting that Faraj, not Baladi, was actually the owner of the 2000 BMW. *Id.* at 140:16-18. In response, Faraj recanted the testimony he gave earlier in the examination and proceeded to give an entirely different account of events. He conceded the vehicle in fact belonged to him, and that he had purchased it in May 2012—over a year prior to the accident—from a person named Joseph Palo

---

[2]   These citations to the examination under oath are to a certified copy of the transcript that Acceptance filed after the trial, rather than to the unsigned copy of the transcript that Acceptance presented at trial. As will be explained later in this opinion, the Court is granting Acceptance's request to supplement the trial record with the certified copy.

Ortiz, who had listed the vehicle for sale in an online advertisement. *Id.* at 144:22-145:15, 147:20-24.  Faraj testified that this was the first vehicle he had ever purchased, and, as a twenty-year-old living in a borough of New York, it would have been prohibitively expensive for him to insure the vehicle. *Id.* at 158:15-159:16. Through an intermediary, Faraj was introduced to Baladi, who was willing to allow Faraj to use one of his dealer plates—and its accompanying insurance coverage—for a fee. *Id.* at 147:11-149:4, 157:20-158:4. Faraj arranged to meet with Baladi in a deli in Manhattan, where Baladi handed over one of his dealer plates in exchange for approximately $1,200 in cash. *Id.* at 147:25-149:22. Faraj testified that, other than this transaction, he had not had any other dealings with Baladi or JJA. *Id.* at 150:21-23. As for his original testimony, Faraj admitted that Baladi had instructed him to tell that story if he were to be contacted by JJA's insurance company:

> Q: Let me put it this way. There's this whole story about you picking up the vehicle at a mechanic. All of that is nonsense; correct?
> A. Correct.
> . . . .
> Q: But you and Baladi needed to get your stories straight relative to that; right?
> A: Well, I mean, that was supposed to be the thing.
> . . . .
> Q: So, every time that Mr. Baladi has indicated to the insurance company that he bought this car himself has been a lie?
> A. It's safe to say.

*Id.* at 151:8-156:14.

At trial, Defendants objected to the introduction of this testimony on two separate grounds, and the Court took their objections under advisement. As will be explained later in this opinion, those objections lack merit and are now overruled.

In addition to presenting Faraj's testimony from the examination under oath, Acceptance also called Joseph Palo Ortiz—the person Acceptance claims sold the 2000 BMW to Faraj—to testify. He testified that in May 2012, he posted an advertisement for the vehicle on the website craigslist, Trial Tr. 20:15-23, which Acceptance corroborated with an email that craigslist sent to Ortiz to confirm the posting. Trial Ex. 9. Ortiz was unable to recall the name of the person to whom he sold the vehicle, *id.* at 28:3, but he did recall that he spoke to the buyer by phone, and Faraj's phone number appeared several times on Ortiz's phone records on May 19, 2012. *Id.* at 25:1-27:25; Trial Ex. 5, at 2-3.[3]

Finally, Acceptance offered admissions Defendants made during discovery that Faraj was not employed by JJA on the day of the accident and had never been a JJA employee. Trial Ex. 4

---

[3] Both Defendants admitted that the telephone number on Ortiz's phone records belonged to Faraj. *See* Trial Ex. 4 (containing copies of each Defendant's admission to Acceptance's request for admission number 6, which asked each Defendant to admit that the phone number in question belonged to Faraj).

3

(containing copies of each Defendant's admissions to Acceptance's requests for admission numbers 13 and 14).

The only evidence that Defendants offered on their behalf was the police report prepared after the accident, which lists "JJA Auto Sale – Service" as the name that was printed on the registration for the 2000 BMW. Trial Ex. 2, at 1.

Acceptance had intended to call Faraj to testify, but his counsel notified Acceptance ahead of time that, if called, Faraj would invoke his Fifth Amendment right against self-incrimination with respect to the testimony he gave during the examination under oath. At trial, the parties instead presented a stipulation containing a number of questions that Acceptance would have asked Faraj that he would have objected to answering under the Fifth Amendment. *See* ECF No. 52.

Neither side called Baladi to testify.

### IV. The examination under oath is admissible.

Defendants raised two objections to the admission of Faraj's testimony from the examination under oath. First, they argued that the examination constituted inadmissible hearsay. Second, they argued that the examination could not be admitted in the form that Acceptance presented it at trial because the transcript had not been signed by either Faraj or the reporter. The Court took both objections under advisement and now overrules them.

First, Faraj's former testimony is not inadmissible hearsay because it meets one of the exceptions to the rule against hearsay. Under Rule 804(b)(3), an out-of-court statement made by a person who is unavailable to testify at trial is not excluded by the rule against hearsay if

> a reasonable person in the declarant's position would have made [the statement] only if the person believed it to be true because, when made, it was so contrary to the declarant's proprietary or pecuniary interest or had so great a tendency to invalidate the declarant's claim against someone else or to expose the declarant to civil or criminal liability.

Fed. R. Evid. 804(b)(3).

Faraj was "unavailable" to testify within the meaning of the rule because he validly invoked his Fifth Amendment right against self-incrimination. Under Rule 804, there are five circumstances under which a person is deemed to be unavailable, one of which is when a witness "is exempted from testifying about the subject matter of the [witness's out-of-court] statement because the court rules that a privilege applies." Fed. R. Evid. 804(a)(1). Faraj's invocation of the Fifth Amendment in response to the questions Acceptance planned to ask was a valid assertion of that right, which means that he was unavailable to testify about those matters. *See United States v. Boyce*, 849 F.2d 833, 836 (3d Cir. 1988) (recognizing that a party's invocation "of his fifth amendment right against self-incrimination made him 'unavailable as a witness' within the meaning of Rule 804").

As for the substance of Faraj's testimony, there is little question that it was so contrary to his pecuniary interest, and so likely to expose him to liability, that he would not have given that testimony if he had not believed it to be true. The testimony he gave stands to strip him of insurance coverage for the accident and could expose him to liability for falsifying his vehicle's registration and attempting to obtain insurance coverage under false pretenses. That is sufficient to satisfy Rule 804(b)(3), which means that his testimony is not barred by the rule against hearsay.

Defendants' second objection, which they raised for the first time on the morning of trial, is that the copy of the transcript that Acceptance offered is inadmissible because it does not contain the signatures of either Faraj or the reporter. For support, they point to a New York State rule of civil procedure, which provides that a "deposition shall . . . be signed by the witness before any officer authorized to administer an oath."[4] N.Y. C.P.L.R. 3116(a). The New York State courts appear to interpret this rule as barring the admission of a deposition that has not been signed by the deponent. *See Pina v. Flik Int'l Corp.*, 808 N.Y.S.2d 752, 753 (N.Y. App. Div. 2006) (per curiam). While Faraj's testimony came during an out-of-court examination under oath taken prior to the filing of this action, not a deposition, at least one lower New York court has applied the rule to such testimony. *See PSG Psychological, P.C. v. State Farm Ins. Co.*, 800 N.Y.S.2d 355, 2004 WL 2997955, at *2 (N.Y. Civ. Ct. 2004) (unpublished table decision) ("This principle applies equally to an examination under oath taken by an insurance company."). But another judge of the same court disagreed, and for good reason. *See JSI Expert Serv. v. Liberty Mut. Ins. Co.*, 801 N.Y.S.2d 235, 2005 WL 851152, at *1 n.1 (N.Y. Civ. Ct. 2005) (unpublished table decision) ("Notwithstanding the decision of my colleague, . . . this Court is of the opinion that [examination under oath] transcripts are not governed by CPLR § 3116 as they are taken prior to the commencement of litigation . . . .").[5]

Even if the New York rule is applicable to out-of-court examinations, there are still two problems with Defendants' objection. The first is that this is a diversity action governed by Pennsylvania law, which means that a New York State rule of procedure has no place here. *See Acceptance Indem. Ins. Co. v. JJA Auto Sales, LLC*, No. 5:15-cv-02954, 2016 WL 3761243, at *3 n.7 (E.D. Pa. July 12, 2016). The second problem is that even if this case were subject to New York substantive law, this particular question would be governed by the applicable Federal Rules of Civil Procedure, not the New York Civil Practice Law and Rules. *See Hanna v. Plumer*,

---

[4] The parties were afforded an opportunity to submit post-trial briefing on this issue. *See* ECF Nos. 62, 63.

[5] That conclusion comports with the generally accepted view of the federal courts that out-of-court examinations under oath are not subject to the Federal Rules that govern the taking and use of depositions. *See Royal Bahamian Ass'n, Inc. v. QBE Ins. Corp.*, No. 10-21511, 2010 WL 4123989, at *2 (S.D. Fla. Oct. 20, 2010) (suggesting that an examination under oath is not subject to "the formal applicability of the Federal Rules of Civil Procedure"); *Zavakos Enters., Inc. v. St. Paul Surplus Lines Ins. Co.*, No. 3:04-cv-381, 2006 WL 83502, at *6 (S.D. Ohio Jan. 12, 2006) ("[A]n examination under oath is not subject to the rules of procedure or evidence . . . ."); *Sarkisyants v. State Farm Mut. Auto. Ins. Co.*, No. C 04-03299, 2005 WL 3097735, at *3 (N.D. Cal. Nov. 14, 2005) (same, citing to a decision of a California state court that reached the same conclusion under California's Code of Civil Procedure), *aff'd*, 256 F. App'x 52 (9th Cir. 2007).

380 U.S. 460, 471 (1965) ("When a situation is covered by one of the Federal Rules, the question facing the court is a far cry from the typical, relatively unguided Erie Choice: the court has been instructed to apply the Federal Rule, and can refuse to do so only if . . . the Rule in question transgresses . . . the terms of the Enabling Act [or] constitutional restrictions."). While the New York rule requires the deposition-taking party to provide the deponent with a copy of the deposition for review and then requires the deponent to sign the deposition, the analogous Federal Rule requires a deposition-taking party to furnish a copy of the deposition only if requested by the deponent and does not require the deponent to sign the deposition unless the deponent revises the testimony. *See* Fed. R. Civ. P. 30(e)(i); Fed. R. Civ. P. 30(e) advisory committee's note to 1993 amendment ("Signature of the deponent will be required only if review is requested and changes are made.").

It is true that the Federal Rules do require the officer before whom a deposition is conducted to "certify in writing that the witness was duly sworn and that the deposition accurately records the witness's testimony," Fed. R. Civ. P. 30(f)(1), but as with the New York rule, it is doubtful that Federal Rule 30 applies to an out-of-court examination taken before any action has commenced.[6] Even if it does, Defendants raised this objection far too late. Under Rule 32, any objection "to how the officer transcribed the testimony—or prepared, signed, certified, sealed, endorsed, sent, or otherwise dealt with the deposition—is waived unless a motion to suppress is made promptly after the error or irregularity becomes known or, with reasonable diligence, could have been known." Fed. R. Civ. P. 32(d)(4). Defendants did not raise this objection until the day of trial, *see* Trial Tr. 10:23-11:5, despite the fact that Acceptance had been relying upon the unsigned transcript from the start of the case, *see, e.g.*, Compl. Ex. C, ECF No. 1-4; Pl.'s Mot. Summ J. Ex. D, ECF No. 24-4, and despite the fact that Defendants' own counsel stated that he relied upon his reading of the unsigned transcript as a basis to verify, under penalty of perjury, that his clients' responses to the requests for admission that Acceptance served during discovery were accurate, *see* Trial Ex. 4.

There is a second reason why this objection has been waived: Defendants failed to raise it in their pretrial memorandum. The scheduling order issued in this case warned the parties that all objections to "the admissibility for any reason (except relevancy) of any item of evidence expected to be offered" needed to be raised in their pretrial memoranda, under penalty of waiver. Order ¶ 8, ECF No. 17. That requirement exists, in part, to afford the parties advance notice of any threshold objections to the form or authenticity of their exhibits so that they can come to trial prepared to address them, rather than be surprised by an objection that could have otherwise been resolved.

That likely would have been the case here, because shortly after the trial concluded, Acceptance notified the Court that it was able to locate the certified copy of the transcript, which it now seeks to add to the trial record. While the Court would have overruled Defendants'

---

[6]      *See supra* note 5.

objection as waived (and likely misplaced, given the doubtful applicability of Rule 30 to an out-of-court examination under oath), the Court will grant Acceptance's request to place the certified copy into the record, which renders the objection moot. *See Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 331 (1971) ("[A] motion to reopen [the record] to submit additional proof is addressed to [the trial court's] sound discretion.").[7]

For these reasons, Defendants' objections to the admission of the relevant portions of Faraj's testimony from the examination under oath are overruled.

## V.     Findings of Fact[8]

Having resolved those objections, the Court can now make the following findings.

In May 2012, Said Faraj paid Joseph Palo Ortiz between $2,000 and $3,000 to acquire a 2000 BMW for Faraj's personal use. Around that same time, Faraj met Fouad Baladi, the owner of JJA Auto Sales, LLC, at a deli in Manhattan, where he paid him approximately $1,200 in cash in exchange for the use of one of JJA's Pennsylvania dealer registration plates. Other than that transaction, Faraj has no other relationship with Baladi or JJA.

On August 6, 2013, while operating the 2000 BMW with the JJA dealer plate affixed to the vehicle, Faraj struck a pedestrian, Amalia Garcia, in Brooklyn, New York. Faraj was not using the vehicle in connection with JJA's business at that time, and Faraj, not JJA, owned the vehicle.

On that date, JJA was insured by Acceptance Indemnity Insurance Company under a Commercial Lines Policy. The policy states that Acceptance agreed to "pay all sums an 'insured' legally must pay as damages . . . caused by an 'accident' and resulting from 'garage operations'" and that Acceptance further agreed to "defend any 'insured' against a 'suit' asking for these damages." Trial Ex. 3, at 18-19. The policy defines garage operations to mean:

> The ownership, maintenance, or use of locations for garage business and that portion of the roads or other accesses that adjoin these locations . . . the

---

[7] When a party seeks permission to supplement the trial record, several considerations come into play, including "[w]hat burden, if any, will be placed on the parties and their witnesses; what undue prejudice may result by not taking new testimony; and what consideration should be given to judicial economy." *Rochez Bros. v. Rhoades*, 527 F.2d 891, 894 n.6 (3d Cir. 1975). Ultimately, the request should be weighed "in light of all the surrounding circumstances" and resolved in "the interest of fairness and substantial justice." *Skehan v. Bd. of Trs. of Bloomsburg State Coll.*, 590 F.2d 470, 478 (3d Cir. 1978) (quoting 6A James Wm. Moore et al., *Moore's Federal Practice* ¶ 59.04, at 36-37 (2d ed. 1974)), *superseded by statute on other grounds as recognized in Smith v. City of Pittsburgh*, 764 F.2d 188, 195 n.3 (3d Cir. 1985)). There is no risk of prejudice to the Defendants (nor any need to allow them an opportunity to submit additional evidence of their own) because, by taking their objections to the transcript under advisement, they were on notice at trial to present all of the evidence they had in the event that their objections were overruled.

[8] "In an action tried on the facts without a jury . . . , the court must find the facts specially and state its conclusions separately," Fed. R. Civ. P. 52(a), which means that the factual findings should not be commingled with the legal conclusions, *Parks, LLC v. Tyson Foods, Inc.*, No. 5:15-cv-00946, 2015 WL 4545408, at *3 (E.D. Pa. July 28, 2015) (quoting 9C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2579 (3d ed. 2008)), and should contain enough detail to provide "a clear understanding of the basis of the decision," *In re Frescati Shipping Co.*, 718 F.3d 184, 196 (3d Cir. 2013) (quoting *H. Prang Trucking Co. v. Local Union No. 469*, 613 F.2d 1235, 1238 (3d Cir. 1980)).

ownership, maintenance or use of the "autos" indicated in Section I of this Coverage Form as covered "autos" . . . [and] all operations necessary or incidental to a garage business.

*Id.* at 31. The policy states that JJA's particular "garage business" is dealing in used cars, *id.* at 2, and the policy states that "covered 'autos'" under the policy are limited to two categories of vehicles: private passenger vehicles that JJA owns, and other, non-owned vehicles during times when they are being used in connection with JJA's business, *id.* at 2, 17.

## VI. Conclusions of Law

Based on those findings, the Court concludes that at the time of the accident, the 2000 BMW that Faraj was operating was not a "covered 'auto'" within the meaning of the policy, nor was Faraj involved in any "operations necessary or incidental" to JJA's business. Accordingly, the accident that occurred on August 6, 2013, does not fall within the scope of the policy, which means that Acceptance does not have a duty to defend Faraj or JJA against any claims arising out of the accident or an obligation to indemnify either of them for any damages that they are legally obligated to pay. A separate order entering judgment in Acceptance's favor follows.

BY THE COURT:


*/s/ Joseph F. Leeson, Jr.*
JOSEPH F. LEESON, JR.
United States District Judge